**In re Robert S. McFADYEN, Christine M. McFadyen, Debtors.**

**A.L. LEE MEMORIAL HOSPITAL, Plaintiff,**

v.

**Christine M. McFADYEN, Defendant.**

**Bankruptcy No. 94–60582.
Adv. No. 94–70084.**

United States Bankruptcy Court, N.D. New York.

Nov. 29, 1995.

---

**330**

James F. Selbach, Syracuse, New York, for Christine M. McFadyen.

Joel N. Melnicoff, Syracuse, New York, for A.L. Lee Memorial Hospital.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

Before the Court is an adversary proceeding commenced by A.L. Lee Memorial Hospital ("Plaintiff") against Christine M. McFadyen, f/k/a Christine Kyle ("Debtor"). Plaintiff's original complaint, filed June 14, 1994, sought a determination of nondischargeability of a debt pursuant to § 523 of the Bankruptcy Code (11 U.S.C. §§ 101–1330) ("Code").[1]   On March 8, 1995, the Plaintiff filed an amended complaint ("Amended Complaint") adding a second cause of action pursuant to Code § 523(a)(8). On March 27, 1995, Debtor filed her amended answer ("Amended Answer") and also as-

serted a counterclaim pursuant to Code § 523(d), seeking costs and attorney's fees.

A trial of the adversary proceeding was held in Utica, New York, on September 14, 1995. At Plaintiff's request, the parties stipulated to the dismissal of the Plaintiff's first cause of action based on fraud and misrepresentation. The parties were afforded an opportunity to file memoranda of law, and the matter was submitted for decision on October 6, 1995.

### JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1) and (b)(2)(I).

### FACTS

According to Debtor's Amended Answer, she participated in the nursing program at Crouse Irving Memorial Hospital ("Crouse Irving"), Syracuse, New York and was employed there for a period in 1993 prior to being employed by Plaintiff. In connection with her employment with the Plaintiff, the Debtor entered into an "RN Scholarship Agreement" ("Agreement") with Plaintiff on or about August 26, 1993 (*see* Plaintiff's Exhibit 3). According to the terms of the Agreement, Plaintiff agreed to pay Debtor's tuition for the completion of the R.N. program at Crouse Irving. The total payment made to Crouse Irving on behalf of the Debtor was $7,645 (*see* Plaintiff's Exhibit 4). Debtor in turn agreed to work for Plaintiff for three years, beginning September 1, 1993. Debtor was required to reimburse Plaintiff the $7,645, plus 15% interest, in the event she terminated employment before the three years had elapsed.

Plaintiff is located in Fulton, New York. In January, 1975, Plaintiff was designated as exempt from federal income taxes pursuant to § 501(c)(3) of the Internal Revenue Code ("IRC"). According to the testimony of Mary Kay Jandrew ("Jandrew"), who was employed as Human Resource Manager for

---

1.   Plaintiff's original complaint did not specify the particular subsection of Code § 523. However, as Plaintiff alleged fraud and misrepresentation

on the part of the Debtor, the Court will presume that Plaintiff's first cause of action is one based on Code § 523(a)(2)(A).

Plaintiff, a tuition buyback program was instituted by the Plaintiff in 1990. To date, Plaintiff has offered tuition buyouts to nine employees, including the Debtor. It was Jandrew's testimony that in the course of her employment interview, Debtor inquired about the possibility of a buyout. Jandrew testified that Plaintiff does not advertise the buyout program or actively recruit individuals for participation in the program. Jandrew further explained that not all applicants are approved for the program and that in addition to her approval, consent is also required from the Director of Nursing. Jandrew testified that Plaintiff budgets for approximately two buyouts each year and that a separate account has been designated for the payment of any approved buyouts. On or about August 24, 1993, a check in the amount of $7,645 made payable to Crouse Irving was requested to be charged to the buyout account on behalf of the Debtor (*see* Plaintiff's Exhibit 4).

Plaintiff alleged that Debtor terminated her employment on or about December 5, 1993, requiring that she immediately reimburse Plaintiff for the tuition paid to Crouse Irving on her behalf. On March 9, 1994, Debtor, along with her husband Robert S. McFadyen, filed a voluntary petition pursuant to Chapter 7 of the Code.

*DISCUSSION*

■ The Bankruptcy Code was enacted to provide a debtor with 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.' *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (*quoting Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)). Congress, however, saw fit to exclude certain obligations, including educational loans, from the general policy of discharge.

In response to concerns about the escalation in the default rate of student loans, in 1978 Congress enacted Code § 523(a)(8) "to curb the abuses of the educational loan system by restricting the ability of a student to discharge an educational loan by filing bankruptcy shortly after graduation, and to safeguard the financial integrity of educational loan programs." *In re Pilcher*, 149 B.R. 595, 598 (9th Cir. BAP 1993), citing 124 Cong. Reg.1791–94 (1978); *see also In re Pelkowski*, 990 F.2d 737, 742–43 (3d Cir.1993). Since then, Code § 523(a)(8) has been amended several times to expand its coverage and make it more difficult for debtors to discharge educational loan obligations. *Id.* at 743.

For example, the 1978 version of Code § 523(a)(8) excepted from discharge those obligations "to a governmental unit, or a nonprofit institution of higher education, for an educational loan." Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, § 523(a)(8), 92 Stat. 2549 (1978). In 1979 the section was amended to include "educational loan[s] made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution of higher education." Act of August 14, 1979, Pub.L. No. 96–56, § 3(1), 93 Stat. 387 (1979). The Bankruptcy Amendments and Federal Judgeship Act of 1984 deleted the words "of higher education." Pub.L. No. 98–353, § 454(a)(2), 98 Stat. 333 (Supp.1984). In 1990 the section was again expanded to include government made, insured or guaranteed educational benefit overpayments, and obligations to repay funds received as an educational benefit, scholarship or stipend. Crime Control Act of 1990, Pub.L. No. 101–647, § 3631(a), 104 Stat. 4865 (1990).

■ For purposes of the decision herein, the Court focuses on that portion of Code § 523(a)(8) which excepts from discharge an educational loan made "under any program funded ... by a ... nonprofit institution ..." In this regard, there are three elements that Plaintiff must establish by a preponderance of the evidence if the debt owed to it by Debtor is to be deemed nondischargeable, namely, that (1) it was an educational loan, (2) made as part of a program, and (3) by a nonprofit institution.

■ Plaintiff presented evidence of its status as a nonprofit organization for tax purposes. Tax exempt status pursuant to IRC § 501(c)(3), which requires that the net earnings of the entity not inure to the benefit

of any private shareholders or individuals, has been deemed to be a basis for a determination of nonprofit status for purposes of Code § 523(a)(8). *See In re Rosen,* 179 B.R. 935, 940 (Bankr.D.Or.1995). Donald A. Cronin, Plaintiff's controller, testified that Plaintiff held tax exempt status under IRC § 501(c)(3) and that any excess revenues generated by Plaintiff were left in the corporation and not distributed to shareholders. As such, the Court concludes that Plaintiff qualifies as a nonprofit organization for purposes of Code § 523(a)(8).

The question then arises whether Plaintiff established that the monies paid to Crouse Irving on behalf of the Debtor were made available through a program funded by the Plaintiff. The focus is on whether there was an outlay of funds which had been set apart for a specific purpose or objective. *See generally In re Alibatya,* 178 B.R. 335, 340 (Bankr.E.D.N.Y.1995). In *In re Segal,* 57 F.3d 342 (3d Cir.1995), the court concluded that there was no "program" in place as the lender did "not make a practice of buying out student debt to obtain employees, nor did it have procedures in place for making such arrangements." *Id.* at 347. In the matter presently before the Court, Plaintiff established that although it did not advertise the program or seek out recipients, a buyout program had been instituted in 1990 and nine individuals, including the Debtor, had qualified for tuition assistance. The Plaintiff also provided evidence to the effect that a separate account was in existence, and that the funds in that account were allocated to be used for tuition reimbursement purposes in connection with Plaintiff's buyout program.

The final issue to be determined is whether the funds made available under the program constituted an educational loan for purposes of Code § 523(a)(8). The fact that the funds were disbursed to Crouse Irving *after* Debtor had received her education does not preclude Plaintiff from seeking to have the debt determined to be nondischargeable pursuant to Code § 523(a)(8). Several courts have concluded that loans consolidated after the completion of a student's education are excepted from discharge pursuant to Code § 523(a)(8). *See e.g. Hiatt v. Indiana State Student Assistance Comm'n,* 36 F.3d 21 (7th Cir.1994), *cert. denied* — U.S. ——, 115 S.Ct. 1109, 130 L.Ed.2d 1074 (1995); *In re Hesselgrave,* 177 B.R. 681 (Bankr.D.Or.1995).

The Court does have concerns, however, about the fact that the loan to the Debtor was made for the purpose of securing Debtor's services as a nurse. In *Segal,* as part of her employment contract, the debtor was provided with a loan to satisfy her obligation to the United States National Health Service. The monies were to be repaid by the debtor to her prospective employer over a period of thirty-six months. The court did not analyze whether the loan made to the debtor was for "educational purposes," electing simply to assume that it was for purposes of the court's analysis. *Segal, supra,* 57 F.3d at 347.

According to the House Report leading to the enactment of Code § 523(a)(8), Congress recognized that "educational loans are different from most loans. They are made *without business considerations,* without security, without cosigners, and relying for repayment solely on the debtor's future increased income resulting from the education." *U.S. Dep't of Health and Human Services v. Smith,* 807 F.2d 122, 125 (8th Cir.1986) (*quoting* H.R.Rep. No. 595, 95th Cong., 2d Sess., 133, reprinted in 1978 U.S.Code Cong. & Admin.News 5963, 6094). (emphasis added). In this case, Jandrew testified that approval by the Director of Nursing was required before final approval of the Agreement with the Debtor. In addition, the loan was contingent on Debtor's continued employment with the Plaintiff for a period of three years. Had the Debtor provided services as a nurse for the required time period, her obligation would have been satisfied. On the other hand, if she terminated employment prematurely, Debtor was required to reimburse Plaintiff. In addition, if she failed to pass the licensing examination and was allowed to continue in Plaintiff's employ, she would also have to reimburse Plaintiff if said employment in a capacity other than an R.N. exceeded one year. The monies paid to Crouse Irving were inextricably tied to the Debtor's employment with the Plaintiff as a registered nurse for a period of three years. It was

an "all or none" proposition. According to the terms of the Agreement, should the Debtor terminate her employment at any time prior to the three years, she was responsible for the full amount of the tuition, namely $7,645, plus 15% interest. Arguably, if she had quit after thirty-five months of employment on August 1, 1996, she would have been required to make full reimbursement. Clearly, the Plaintiff's program was intended not as an educational benefit to the Debtor, but rather it was intended to benefit the Plaintiff by assuring that it had a qualified nursing staff on a relatively long-term basis.

Clearly, these contingencies give emphasis to the fact that the monies were being made available on the basis of certain business considerations of the Plaintiff and not simply to allow the Plaintiff to finance an education. The Court, therefore, concludes that the loan was not made for "educational purposes," and the debt is deemed dischargeable.

The final issue before the Court is whether to grant Debtor's counterclaim seeking to recover costs and attorney's fees pursuant to Code § 523(d). To prevail on a motion pursuant to Code § 523(d), the debtor must establish (1) the creditor sought a determination of the dischargeability of a debt pursuant to Code § 523(a)(2), (2) the debt is a consumer debt, and (3) the debt was discharged. *See generally In re Harvey,* 172 B.R. 314, 317 (9th Cir. BAP 1994), citing *In re Kullgren,* 109 B.R. 949, 953 (Bankr. C.D.Cal.1990) and *FCC Nat'l Bank v. Dobbins,* 151 B.R. 509, 511 (W.D.Mo.1992). The burden then shifts to the creditor to prove that its actions in requesting said determination were substantially justified and that there are special circumstances that would make an award of fees unjust. *Id.,* citing *In re Rhodes,* 93 B.R. 622, 624 (Bankr.S.D.Ill. 1988).

In the matter *sub judice,* there is no question that Plaintiff initially sought a determination of the dischargeability of a debt based on fraud and misrepresentation. Although not specified in Plaintiff's Amended Complaint, the Court has interpreted Plaintiff's initial allegations to be based on Code §§ 523(a)(2)(A).

The Code defines "consumer debt" as one "incurred by an individual primarily for a personal, family, or household purpose." *See* Code § 101(8). In this case, Debtor incurred the original debt to Crouse Irving for the purpose of obtaining a nursing degree. When Plaintiff reimbursed Crouse Irving on behalf of the Debtor, as discussed above, it was in connection with the employment of the Debtor. The courts generally ascribe a *business* purpose, rather than a personal, family or household purpose to debts which are incurred "with an eye toward profit" (*see In re Booth,* 858 F.2d 1051 (5th Cir.1988)) and which are "motivated for ongoing business requirements" (*see In re Berndt,* 127 B.R. 222, 224 (Bankr.D.N.D.1991)). In this case, the Court concludes that, from the Debtor's perspective, the debt was not incurred for purposes of generating a profit, but was incurred for personal purposes and constitutes a consumer debt.

The third element to be established by Debtor is that she received a discharge of the debt. In his opening remarks, counsel for Plaintiff requested that it be permitted to discontinue its first cause of action alleging fraud and misrepresentation on the part of the Debtor. In making the request, Plaintiff's counsel acknowledged that by discontinuing the cause of action and requiring no testimony or evidence, it was conceding that Debtor "wins that cause of action."

Debtor's counsel objected to the request, describing it as "litigation by ambush." Debtor's counsel asserted that Plaintiff's original complaint was filed well over a year ago and at no time prior to trial had Plaintiff sought to withdraw its first cause of action. As a result, he had spent time preparing to rebut Plaintiff's allegations of fraud and misrepresentation. Although both parties agreed to stipulate to the discontinuance of Plaintiff's first cause of action, the Court concludes that as far as Plaintiff's allegations made pursuant to Code § 523(a)(2)(A), the debt was discharged. The fact that no trial occurred on the merits of Plaintiff's cause of action based on Code § 523(a)(2)(A) does not preclude the Debtor from recovering costs and attorney's fees pursuant to Code

§ 523(d). *See Kullgren, supra,* 109 B.R. at 953.

 Any recovery of attorney's fees and costs may only be denied by the Court if Plaintiff is able to establish that it was substantially justified in seeking to have the debt discharged pursuant to Code § 523(a)(2)(A). In other words, Plaintiff must prove that its allegations against Debtor "had a reasonable basis in law and fact." *See Dobbins, supra,* 151 B.R. at 512 (citation omitted); *Harvey, supra,* 172 B.R. at 318. As noted above, Plaintiff presented the Court with no evidence of fraud or misrepresentation on the part of the Debtor. Therefore, the Court has no basis for concluding that Plaintiff was substantially justified in bringing the cause of action pursuant to Code § 523(a)(2)(A). Nor has Plaintiff suggested that there are special circumstances which would preclude the Court's awarding attorney's fees and costs to Debtor. Indeed, Debtor was prepared to defend Plaintiff's allegations of fraud and misrepresentation on the day of the trial. Plaintiff's last minute request that it be permitted to discontinue that particular cause of action does not relieve it from having to pay Debtor's attorney's fees and costs pursuant to Code § 523(d).

For the foregoing reasons, it is

ORDERED that Plaintiff's Complaint against the Debtor, alleging a causes of action pursuant to Code § 523(a)(8) be dismissed; it is further

ORDERED that pursuant to Code § 523(d), Debtor be awarded attorney's fees and costs associated with the defense of the cause of action based on Code § 523(a)(2)(A); and it is further

ORDERED that counsel for Debtor file with the Court and serve on Plaintiff an affidavit, along with time records, in support of said award of attorney's fees and costs, said affidavit to be filed and served within 30 days of the date of this Order.